IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PODIUM CORPORATION INC.,<br><br>        Plaintiff,<br><br>v.<br><br>CHEKKIT GEOLOCATION SERVICES, INC., EUGENE TAGLE, MYLES HIEBERT, DANIEL FAYLE, LEE KLIMPKE, and EMILY FRANZ-LIEN,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**<br><br>Case No. 2:20-cv-352-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court are three motions to dismiss filed by the individual defendants[1] in this case. First, Defendant Eugene Tagle ("Tagle") moves to dismiss two claims: (1) civil conspiracy and (2) aiding and abetting violations of the Computer Fraud and Abuse Act ("CFAA") [ECF No. 105]. Second, Defendants Myles Hiebert ("Hiebert"), Daniel Fayle ("Fayle"), and Lee Klimpke ("Klimpke") together move to dismiss the same two claims as Tagle [ECF No. 111]. Third, Defendant Emily Franz-Lien ("Franz-Lien) moves to dismiss for lack of personal jurisdiction or, in the alternative, moves to dismiss all three claims against her for failure to state a claim [ECF No. 109]. For the reasons stated below, the court GRANTS the motions to dismiss by Tagle, Hiebert, Fayle, and Klimpke and GRANTS IN PART and DENIES IN PART the motion by Franz-Lien.

---

[1] The court refers to Eugene Tagle, Myles Hiebert, Daniel Fayle, Lee Klimpke, and Emily Franz-Lien as the "individual defendants." The court refers to the individual defendants and Chekkit Geolocations Services, Inc. collectively as "Defendants."

1

## BACKGROUND

Plaintiff Podium Corporation ("Podium"), founded in 2014, is a Delaware corporation with its principal place of business in Lehi, Utah. Podium markets cloud-based software that helps small businesses engage customers. Podium's platform includes features such as web-based messaging and tools to generate more online reviews.

Defendant Chekkit Geolocation Services, Inc. ("Chekkit"), founded in 2016, is a Canadian corporation with its principal place of business in Winnipeg, Canada. Chekkit began as a customer interaction management platform and, around 2018, added reputation management tools to its offerings. At present, Chekkit sells software that largely mirrors Podium's platform. Chekkit has four directors: Hiebert as Chief Executive Officer, Fayle as Chief Security Officer, Klimpke as Chief Technology Officer, and Franz-Lien as Chief Operating Officer. Each director has worked for Chekkit for the company's entire existence. Chekkit employed Tagle as a sales representative from October 2, 2017 to November 18, 2018, and again from November 11, 2019 to June 2, 2020. Tagle no longer works at Chekkit.

Chekkit and Podium are direct competitors. This dispute arises out of tactics that Chekkit and its employees used to compete with Podium. In early 2018, Defendants hatched a plan to learn more about Podium's features. Defendants hoped to import those same features, along with Podium's general "feel," into their own product. Defendants aimed to create a nearly identical platform that they could market to businesses—many of whom already had contracts with Podium—at a lower price point.

As a first step, Tagle, posing as an employee of a food services business ("Munch Box"), scheduled two demos with Podium sales representatives on April 2, 2018 and April 20, 2018. Tagle and Fayle attended the meetings and asked questions about Podium's review feature,

which assists customers with reputation management. In October 2019, Chekkit agents began targeting Podium customers, attempting to convince them to switch to Chekkit. Hiebert, Fayle, and Tagle messaged Podium customers through Podium's webchat widget. They told Podium customers that they could save money while purchasing the exact same product, and provided a link to a webpage comparing Chekkit and Podium's services. At the same time, Klimpke and Franz-Lien worked behind the scenes to assist with onboarding new customers and building features that mirrored Podium's features.

In an attempt to gain further information about Podium's platform, Defendants decided to purchase a Podium subscription. Knowing that Podium would not sell a subscription to Chekkit or its employees, Defendants created the alias "Eric Winters," owner of Munch Box. Defendants built a website and Facebook page for Munch Box. Tagle—masquerading as Winters—scheduled another demo with Podium on December 5, 2019. Tagle used his personal phone number and personal email address to schedule the demo. During the demo, Tagle asked many specific questions about Podium's newest feature, Teamchat. Tagle, as Winters, purchased a Podium subscription for Munch Box the next day using Hiebert's personal credit card and his own personal email and phone number. Tagle signed Podium's Terms of Service and Acceptable Use Policy under the name Eric Winters. Defendants cancelled the Munch Box Podium subscription at the end of December 2019.

Once Podium discovered Chekkit's scheme, Podium sent Chekkit a cease-and-desist letter on December 24, 2019. The letter demanded that Chekkit immediately cease and desist from accessing Podium's services, using any information Chekkit obtained from Podium's services, using Podium's name to promote non-Podium services, using Podium's trademarks without authorization, using Podium's webchat widget to target Podium's customers, and making

unauthorized copies of Podium's copyrighted materials. On January 14, 2020, Chekkit acknowledged the cease-and-desist letter and promised that it was in compliance with the letter's demands. But, according to Podium, Chekkit continued to engage in the type of conduct proscribed by the letter. On January 21, 2020, Podium invoked the dispute resolution clause contained within its Terms of Service, which required that the parties engage in mediation by February 22, 2020. After receiving no response from Chekkit, Podium proceeded to file this lawsuit. Podium outlined ten causes of action, seven of which pertain solely to Defendant Chekkit. Two of the remaining claims, intentional interference with Podium's existing and prospective economic relations and civil conspiracy, are directed at all Defendants. The final claim, aiding and abetting violations of the CFAA, pertains to the individual defendants.

**ANALYSIS**

The court first addresses Franz-Lien's personal jurisdiction arguments asserted under Federal Rule of Civil Procedure 12(b)(2). It then addresses the individual defendants' Rule 12(b)(6) motions to dismiss the civil conspiracy and aiding and abetting violations of the CFAA claims. Finally, it addresses Franz-Lien's Rule 12(b)(6) motion to dismiss the intentional interference claim.

## I.   MOTION TO DISMISS PURSUANT TO RULE 12(b)(2)

A plaintiff bears the burden of establishing that a court has personal jurisdiction over a defendant. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). When the issue of personal jurisdiction "is raised early on in litigation, based on pleadings (with attachments) and affidavits, that burden can be met by a prima facie showing." *Id.* As with all motions to dismiss, the court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Albers v. Bd. of Cnty. Comm'rs*, 771 F.3d 697,

700 (10th Cir. 2014) (citation omitted). Finally, "[i]n evaluating a motion to dismiss, we may consider not only the complaint, but also the attached exhibits." *Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011).

Podium advances two independent justifications for the court to find personal jurisdiction over Franz-Lien. First, it argues that Franz-Lien—through Fagle's signature—consented to personal jurisdiction in this court by agreeing to Podium's Terms of Service, which require parties to submit to personal jurisdiction in Utah. Second, it contends that, even if Franz-Lien is not bound by the Terms of Service, this court still has personal jurisdiction based on Franz-Lien's contacts with Utah. The court begins by addressing the second rationale, the traditional personal jurisdiction test.

### A.    *Traditional Personal Jurisdiction Test*

Determining whether a court has personal jurisdiction over a defendant requires a two-part inquiry: Does exercising personal jurisdiction comport with (1) a state's long-arm statue and (2) principles of constitutional due process? Because Utah's long-arm statute "should be applied so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause," the court need only address whether the exercise of personal jurisdiction over Defendants comports with constitutional due process. UTAH CODE § 78B-3-201(3).

For the court to exercise personal jurisdiction, due process requires that "the nonresident defendant must have 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *New World Int'l, Inc. v. Ford Glob. Techs., LLC*, 859 F.3d 1032, 1037 (Fed. Cir. 2017) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Personal jurisdiction may be either general or specific. To exercise general jurisdiction over a nonresident defendant, the defendant must engage in

"continuous and systemic general business contacts," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984), "of a sort that approximate physical presence in the state," *Shrader*, 633 F.3d at 1243 (citation omitted). Franz-Lien had no systemic contacts with Utah. Therefore, the only issue is whether the court may exercise specific personal jurisdiction over Franz-Lien.

Under specific personal jurisdiction, a district court can hear claims against a defendant only where that defendant "has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985) (citations omitted). Once a plaintiff has met this burden, "the defendant may point to other factors 'to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" *New World*, 859 F.3d at 1037 (quoting *Burger King*, 471 U.S. at 476). In short, there are three prongs to establish specific personal jurisdiction: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is reasonable and fair." *Id.* (citation omitted). The court addresses each prong in turn.

### i.  Purposeful Direction

To establish minimum contacts with the forum state, the defendant must have "purposefully directed its activities at residents of the forum state." *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017) (citation omitted). The purposeful direction inquiry "can appear in different guises." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008). But, at bottom, the requirement "ensures that a

defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475 (citations omitted).

Here, Podium attempts to satisfy the purposeful direction requirement by applying the harmful effects test set forth by the Supreme Court in *Calder v. Jones* and applied by the Tenth Circuit in *Dudnikov*, 514 F.3d at 1071-72 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). The test requires three elements: (1) the defendant commits an intentional act, (2) the defendant's action is expressly aimed at the forum state, and (3) the defendant knows that the brunt of the injury will be felt in the forum state. *Id.* at 1072.

Podium easily meets the first and third prongs. Franz-Lien committed an intentional act by participating in an alleged scheme to wrongfully gain information about Podium's platform and use the misappropriated information to replicate Podium's platform and steal Podium's customers. Franz-Lien took a number of intentional steps in furtherance of the alleged scheme to interfere with Podium's business. She assisted Tagle in preparing for a demo where he used false pretenses to extract information from Podium about its platform. ECF No. 85-2, at 5. She debriefed the deceitful demos with Tagle and other Chekkit employees. ECF No. 85-2, at 4-5. Just days after Chekkit purchased a Podium subscription using a false identity, Franz-Lien discussed how to use the misappropriated information to create a nearly identical product. ECF No. 83-17. And Franz-Lien played a critical role in building the features, co-opted from Podium's platform, that gave Chekkit's platform the look and feel of Podium's platform. ECF Nos. 85-2, at 7; 85-7, at 5. Finally, Podium alleges that Franz-Lien worked together with Tagle, Hiebert, Fayle, and Klimpke to plan the Eric Winters ruse in order to gain inside access to

Podium's proprietary information. ECF No. 83, ¶ 35.[2] With regard to the third prong, Franz-Lien knew any injury her acts inflicted on Podium would be felt in Utah because she knew that Podium was located in Utah. ECF No. 85-2, at 6. Therefore, the issue that occupies much of the parties' briefing is whether Franz-Lien "expressly aimed" her actions at Utah. The court finds that the allegations against her satisfy the second prong.

Franz-Lien relies on a cramped interpretation of the "expressly aimed" prong. She contends that the test requires that she personally sent a message to someone in Utah. *See* ECF No. 110, at 15 ("But Podium has not pointed to *any* message that Ms. Franz-Lien personally sent to *anyone* in Utah."). But as the Tenth Circuit has explained, the "expressly aimed" prong focuses on a defendant's intentions—what was the "'focal point' of [the defendant's] purposive efforts." *Dudnikov*, 514 F.3d at 1075 (quoting *Calder*, 465 U.S. at 789). A court should not solely "focus on the physical direction" of communications by the defendant but should also consider where the defendant aimed the "ultimate purpose" of her actions. *Id.*

Therefore, the express aiming test can be satisfied even where the defendant sent no messages into the forum state. To illustrate, the Tenth Circuit offers the analogy of a bank shot in basketball: "A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket." *Id.* Here, Franz-Lien directed messages at her colleagues in Canada, but she did so with the further intention of harming Podium's business in Utah. *See id.* (finding personal jurisdiction in

---

[2] And the attached exhibits support this allegation. Franz-Lien was a director of Chekkit, along with Hiebert, Klimpke, and Fayle. ECF No. 83-12, at 12 ("The individuals involved in that decision were the four directors of the company, Myles Hiebert, Emily Franz-Lien, Lee Klimpke, and Daniel Fayle."). The four directors appear to have been involved in major business decisions, like Chekkit's transition from solely customer interactions to reputation management. *Id.* It is a reasonable inference that, as a director, Franz-Lien assisted in forming the plan to impersonate a small business and gain unauthorized access to Podium's platform.

Colorado where "defendants intended to send the NOCI to eBay in California, but they did so with the ultimate purpose of cancelling plaintiff's auction in Colorado"). Stated another way, Franz-Lien expressly aimed to reach into Utah and interfere with Podium's business. The fact that she used communications directed at colleagues in Canada to effectuate her ultimate purpose does not diminish her express aim to harm a business in Utah. *See id.* ("[T]he 'express aiming' test focuses more on a defendant's intentions—where was the 'focal point' of its purposive efforts . . . ." (quoting *Calder*, 465 U.S. at 789)). Because Podium satisfies all three prongs of the harmful direction test, it has sufficiently alleged purposeful direction.

### ii.    Arising Out Of

Once Podium establishes that Franz-Lien's conduct was "purposefully directed" at Utah, Podium must next demonstrate that Podium's injuries "arise out of" or "relate to" the conduct that comprises Franz-Lien's contacts with the forum. *See Burger King*, 471 U.S. at 472-73 (citation omitted). "The arising-out-of component of the test requires courts to ensure that there is an adequate link between the forum State and the claims at issue, regardless of the extent of a defendant's other activities connected to the forum." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 840 (10th Cir. 2020) (citing *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1781 (2017)). Podium's allegation that Franz-Lien has intentionally interfered with its business arises out of Franz-Lien's activities enumerated above. Accordingly, Podium has sufficiently alleged the second prong of specific personal jurisdiction.

### iii.    Reasonable and Fair

The final inquiry is whether the exercise of personal jurisdiction over Franz-Lien in Utah would offend traditional notions of fair play and substantial justice. *See Int'l Shoe*, 326 U.S. at 316. Relevant factors include (1) the burden on the defendant, (2) the forum state's interest in

adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See Burger King*, 471 U.S. at 476-77. Applying these factors to Franz-Lien, the court sees no unfairness in permitting this suit to proceed against her in Utah.

The second and third factors weigh strongly in favor of personal jurisdiction. Utah "ha[s] an important interest in providing a forum in which [its] residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1096 (10th Cir. 1998) (citing *Burger King*, 471 U.S. at 483). Relatedly, Podium has an interest in obtaining convenient and effective relief in its home state of Utah.

The first and fourth factors similarly support jurisdiction. The burden on Franz-Lien of litigating in Utah is light. Defendants have already retained counsel located in Salt Lake City to represent Franz-Lien along with the other defendants. And despite residing in a foreign country, modern transportation and communication has lessened the burden on defendants like Franz-Lien. *See Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1356 (Fed. Cir. 2002) (finding that the burden of subjecting Canadian defendants to litigation in Kansas "is relatively minimal"); *Aristech Chem. Int'l, Ltd. v. Acrylic Fabricators*, 138 F.3d 624, 629 (6th Cir. 1998) (noting that Canadian defendants do not encounter a particularly heavy burden in light of modern transportation and communication methods and the similarity of the Canadian and American legal systems). And litigating the case against Franz-Lien in Utah serves the interest of judicial efficiency because this court is already exercising jurisdiction over the other defendants. Podium will likely use much of the same evidence to prove the claims against

Franz-Lien as it will use against the other defendants. Duplicating these proceedings in a foreign forum does not serve efficiency goals.

Finally, with regard to the fifth prong, this case does not strongly implicate the substantive social policies of Canada. Accordingly, we conclude that the exercise of personal jurisdiction in Utah over Franz-Lien comports with traditional notions of fair play and substantial justice. The court, thus, DENIES Franz-Lien's motion to dismiss for lack of personal jurisdiction.

### B.      Waiver of Personal Jurisdiction

Because the court finds that it has personal jurisdiction under the traditional specific personal jurisdiction test, it need not consider whether Franz-Lien expressly waived personal jurisdiction via Tagle's signature on the terms of service.

## II.      MOTIONS TO DISMISS PURSUANT TO RULE 12(b)(6)

The court may dismiss claims under Federal Rule of Civil Procedure 12(b)(6) where the plaintiff fails to "state a claim upon which relief can be granted." To adequately state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). When considering a motion to dismiss for failure to state a claim, the court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). And, as with the motion to dismiss for lack of personal jurisdiction, the court "may consider not only the complaint, but also the attached exhibits." *Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011). The individual defendants move to dismiss the civil conspiracy claim and the aiding and abetting a violation of the CFAA

claim. Franz-Lien also moves to dismiss the intentional interference claim. The court addresses each claim in turn.

### A.      Civil Conspiracy Claim

In order to plead a civil conspiracy claim, a complaint must allege sufficient facts to establish "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Pohl, Inc. of Am. v. Webelhuth*, 201 P.3d 944, 954-55 (Utah 2008) (citation omitted). Tagle, Franz-Lien, Hiebert, Fayle, and Klimpke all contend that the intracorporate immunity doctrine bars Podium's civil conspiracy claim against them. The intracorporate immunity doctrine holds that "acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation." *ePlus Tech., Inc. v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002); *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) ("[A]n agreement between or among agents of the same legal entity . . . is not an unlawful conspiracy."). In response, Podium argues that its civil conspiracy claim survives the intracorporate immunity doctrine for several reasons: (1) Tagle was not an employee for some portion of the conspiracy, (2) the independent personal stake exception applies, and (3) Utah courts might decline to adopt the intracorporate immunity doctrine. The court addresses each of Podium's responses in turn, and ultimately concludes that the intracorporate immunity doctrine bars the civil conspiracy claim against the individual defendants.

### i.      Tagle's Employment Status

Podium alleges that Chekkit employed Tagle from October 2017 to November 2018 and November 2019 to June 2020. Podium contends that because Tagle was not a Chekkit employee for most of 2019, when the conspiracy continued, the conspiracy cannot be considered

12

"intracorporate." In particular, Podium alleges that Tagle took actions in furtherance of the conspiracy in October 2019, when he was not employed by Chekkit. *See* ECF No. 83, ¶ 31; *see also* ECF No. 85-3, at 3 (discussing that on October 30, 2019, Tagle talked to Prince George Dental Group); ECF No. 85-4, at 2 (dividing up Podium clients to contact between Hiebert, Fayle, and Tagle on October 25, 2019); ECF No. 85-5, at 2 (discussing sales tactics among Hiebert, Fayle, and Tagle on October 30, 2019). Consequently, Podium argues that Chekkit, Hiebert, Fayle, Klimpke, and Franz-Lien conspired with a non-employee—Tagle—in October 2019, thus defeating the intracorporate immunity doctrine.

But the intracorporate immunity doctrine applies to both employees and agents of a company. *See Godfredson v. JBC Legal Grp., P.C.*, 387 F. Supp. 2d 543, 550 (E.D.N.C. 2005) ("[T]he intra-corporate immunity doctrine . . . states that a corporation cannot successfully conspire with its own officers, employees, or *agents* . . . ." (citing *ePlus Tech.*, 313 F.3d at 169) (emphasis added)). And Podium alleges that "[i]n October 2019, Tagle and other agents of Chekkit began targeting Podium's customers." ECF No. 83, ¶ 31. The only reasonable inference from Podium's pleadings, then, is that Tagle was an employee *or* agent of Chekkit from October 2017 to November 2018 and October 2019 to June 2020. Podium makes no allegations—nor is there any evidence in the exhibits submitted alongside the amended complaint—that Tagle participated in the conspiracy outside of the time period during which he was an agent or employee of Chekkit.

The intracorporate immunity doctrine rests on the principle that "acts of corporate agents are acts of the corporation itself" and thus no conspiracy occurs when a corporate agent and her corporation act in concert. *ePlus Tech.*, 313 F.3d at 179. Here, every single action that Podium alleges that Tagle took occurred while Tagle was, by Podium's own admission, an employee or

agent of Chekkit. Therefore, Podium has failed to allege any conspiratorial actions involving an individual external to Chekkit. Stated another way, all of the acts that make up the alleged conspiracy were done by corporate agents—which are considered acts of the corporation itself. Therefore, Tagle's interlude as a non-employee, during which he did not participate in the conspiracy, does not defeat application of intracorporate immunity doctrine.

### ii. Independent Personal Stake Exception

Podium also argues that the independent personal stake exception bars application of the intracorporate conspiracy doctrine here. "Courts have recognized an exception [to the intracorporate conspiracy doctrine] where an officer or agent has an independent personal stake in achieving the corporation's illegal objective." *Brever v. Rockwell Int'l Corp.*, 40 F.3d 1119, 1127 (10th Cir. 1994) (citations omitted). This exception applies where "officers, directors, or employees of a corporation . . . personally benefit from the illegal activities in a way separate and distinct from the corporation." *Wegerer v. First Commodity Corp. of Bos.*, 744 F.2d 719, 724-25 (10th Cir. 1984).

But Podium adduced no evidence that the individual defendants would personally benefit from the conspiracy in a manner separable from the conspiracy's benefit to the corporation itself. To support application of the independent personal stake exception, Podium cites two quotes from Chekkit employees. First, Fayle said "money is money and money is comission [sic]." ECF No. 85-5, at 2. This quote simply points to the goal—shared by Chekkit and its employees—to increase sales in order to earn more money. Podium does not allege that the commissions were in any way independent of Chekkit's financial success. *C.f. Margae, Inc. v. Clear Link Techs., LLC*, No. 2:07-cv-916-CW, 2008 WL 5377932, at *2 (D. Utah Dec. 22, 2008) (invoking the independent personal stake exception where individual defendants diverted commissions owed to

a plaintiff solely for themselves). Thus, both the company and the employees stood to gain if Chekkit succeeded. Second, Klimpke said "let's get [th]em scared then maybe they'll just buy us out." ECF No. 85-6, at 2. Again, acquisition by a larger company—often the goal for technology start-up companies like Chekkit—would financially benefit both Chekkit and its employees. At bottom, Podium fails to allege that any personal financial benefit received by individual defendants as a result of the conspiracy would be distinct from Chekkit's corporate financial benefit.

In fact, in cases where the purported independent stake is financial, the "'independent personal stake' doctrine applies only when the officer has an outside economic interest, such as ownership of a competing corporation, through which he will benefit from the restraint." *Holter v. Moore & Co.*, 702 F.2d 854, 857 n.8 (10th Cir. 1983). But Podium has failed to allege any outside economic interest on the part of the individual defendants.

And the cases cited by Podium do not salvage its position. *Brever* is about two whistleblowers who accused their company and its employees of a conspiracy to deter their whistleblower testimony about illegal activity in the workplace. 40 F.3d at 1127-28. The primary holding of *Brever* addresses the applicability of the independent personal stake exception to civil rights cases. *Id.* at 1127. And further, to the extent that *Brever* is relevant here, the *Brever* court found an independent personal stake where the individual employee defendants were motivated to join the conspiracy by potential exposure to personal criminal liability. *Id.* Avoiding personal criminal liability is, of course, a "separate and distinct" benefit from a corporation avoiding criminal liability. But because there is no criminal liability at stake here, *Brever* is inapposite.

*Wegerer* is similarly unhelpful. The case is about two employees who, among other things, sold several company offices and pocketed the proceeds directly. *See Wegerer*, 744 F.2d

at 726. *Wegerer* was not a case where rising tides lifted all boats. Rather, the individual defendants used the conspiracy to effectuate sales from which they personally collected the entire profit. In contrast, the individual defendants here stood to gain financially only insofar as Chekkit's financial prospects improved.

In sum, Podium has pointed to no independent personal stake of any individual defendant. Indeed, Podium relies on the individual defendants' personal financial interests, which are intimately tied to the success of the company. Therefore, the court finds that the independent personal stake exception does not apply here.

### iii.     Utah Supreme Court's Stance on the Doctrine

Finally, Podium attempts to raise doubts as to whether the Utah Supreme Court would adopt the intracorporate immunity doctrine. Because both parties acknowledge that the Utah Supreme Court has not determined whether to adopt the intracorporate immunity doctrine, this court must predict whether the Utah Supreme Court would adopt the doctrine. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1228 (10th Cir. 2001) ("When no decision of a state's highest court has addressed an issue of that state's law, the federal court confronted with that issue must predict how the State's highest court would rule." (citation and alterations omitted)). In making its prediction, the court is "free to consider all resources available, including decisions of [Utah] courts, other state courts and federal courts, in addition to the general weight and trend of authority." *Fed. Deposit Ins. Corp. v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000).

Defendants argue that the Utah Supreme Court would adopt the intracorporate immunity doctrine because it is uncontroversial and because a judge within the District of Utah has already predicted that the Utah Supreme Court would accept it. *See Margae*, 2008 WL 5377932, at *2 n.2. Podium counters that the outcome is not so obvious. It points to several states that have

declined to adopt the doctrine or have opted to leave the issue undecided. ECF No. 130, at 6. But the general weight and trend of authority points towards application of the doctrine in Utah. *See Cox v. Cache Cnty.*, No. 1:08-cv-124-CW, 2013 WL 4854450, at *5 (D. Utah Sept. 11, 2013) ("[M]ost other states [except South Carolina and Alabama] that have addressed the issue do apply intracorporate immunity where two or more employees of a single corporation are alleged to have conspired."); J.S. Nelson, *The Intracorporate Conspiracy Trap*, 36 CARDOZO L. REV. 969, 985 (2015) ("[T]he intracorporate conspiracy doctrine has now been approved by large numbers of states . . . ."). And Podium fails to cite any caselaw suggesting that the Utah Supreme Court would be disposed to part with "most other states" and refuse to adopt the doctrine. *See Cox*, 2013 WL 4854450, at *5. Absent any such evidence, the court finds that the Utah Supreme Court would likely adopt the intracorporate immunity doctrine.

In sum, the intracorporate immunity doctrine applies in this case to preclude a civil conspiracy claim. Podium alleges a conspiracy among employees and agents of a company and the company itself. But agency principles, which state that an agent's acts are attributed to the principal, render agents of Chekkit legally incapable of conspiring together with the company. And Podium cannot invoke the personal stake exception; it does not allege that the individual defendants have any personal interest in the conspiracy separate from Chekkit's interests. Accordingly, the court GRANTS the individual defendants' motions to dismiss the civil conspiracy claim.

### B.      *Aiding and Abetting Violations of the CFAA Claim*

All five individual defendants also argue that the court should dismiss Podium's tenth cause of action for aiding and abetting violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. The individual defendants argue that the CFAA does not provide a civil cause of

action for aiding and abetting. In support, the individual defendants cite a district court case where the court refused to recognize a civil cause of action for aiding and abetting violations of the CFAA. *See Flynn v. Liner Grode Stein Yankelevitz Sunshine Regenstreif & Taylor LLP*, No. 3:09-cv-00422-PMP-RAM, 2011 WL 2847712, at *3 (D. Nev. July 15, 2011); *see also Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 327-28 (M.D. Pa. 2014). Podium disputes that proposition and, in support, cites two district court cases which take the opposite position. *See COR Secs. Holdings Inc. v. Banc of Cal. N.A.*, No. SA CV 17-1403-DOC (JCGx), 2018 WL 4860032, at *7-8 (C.D. Cal. Feb. 12, 2018); *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1295-98 (S.D. Fla. 2017). While the court considers these cases, none of the cited cases bind this court.

In light of rationales provided by the Supreme Court and the Tenth Circuit in comparable contexts, the court declines to impose civil aiding and abetting liability here. As the Supreme Court held in the context of civil liability for securities violations, "[i]f . . . Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994). And the Tenth Circuit similarly refused to recognize civil aiding and abetting liability in the Electronic Communications Privacy Act because "[t]he provision includes no aiding-and-abetting language." *Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1246 (10th Cir. 2012). Indeed, Congress has repeatedly shown that it knows how to impose aiding and abetting liability when it so desires. *See* 7 U.S.C. § 25(a)(1) (providing a private right of action against anyone who "violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter"); 15 U.S.C. § 689n(a) (imposing liability for "any person who, directly or indirectly, authorizes, orders, participates in, causes, brings about,

counsels, aids, or abets in the commission of any acts [that violate this statute]"). But, here, it imposed no such liability. The CFAA creates liability only for individuals who violate the statute, or any individual who "conspires to commit or attempts to commit an offense under [the statute]." 18 U.S.C. § 1030(a)-(b). Because "the text of the statute controls our decision," the court "cannot amend the statute to create liability for acts that are not themselves . . . within the meaning of the statute." *Cent. Bank*, 511 U.S. at 173, 177-78; *Fed. Election Comm'n v. Swallow*, 304 F. Supp. 3d 1113, 1118 (D. Utah 2018) ("In *Central Bank* the United States Supreme Court held that the government cannot infer secondary liability when the statute in question is silent on that subject."). Aiding and abetting is not enumerated as a means of violating the CFAA. Accordingly, the court will not read such liability into the statute.

Across three briefs, Podium provides only one argument for why this court should recognize civil aiding and abetting liability under 18 U.S.C. § 1030—that the Tenth Circuit has already recognized aiding and abetting liability under the statute in the criminal context. *See United States v. Willis*, 476 F.3d 1121 (10th Cir. 2007). But the government charged Willis under 18 U.S.C. § 1030(a)(2)(C) *and* 18 U.S.C. § 2, the general criminal aiding and abetting statute. *Id.* at 1123. Therefore, *Willis* cannot stand for the proposition that the Tenth Circuit approved of aiding and abetting liability solely under § 1030, and especially not in the civil context. Accordingly, because the court cannot read a novel theory of liability into a statute, the court GRANTS the individual defendants' motions to dismiss Podium's cause of action for aiding and abetting a violation of the CFAA.

In the alternative, Podium moves to amend the complaint to allege a direct violation of the CFAA. As Defendants point out, DUCivR 7-1(b)(1)(A) prohibits parties from including motions in response memoranda, and instead instructs them to make such motions in a separate

filing. If Podium wishes to amend its complaint, it should move the court to do so and explain any good cause for its failure to seek leave to amend within the time allowed by the operative scheduling order.

### C.    Intentional Interference Claim

Finally, Franz-Lien moves to dismiss Podium's eighth cause of action, intentional interference with Podium's existing and prospective economic relations. To state a claim for intentional interference, a plaintiff must allege "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015) (citation and emphasis omitted). Podium has adequately alleged this cause of action as to Franz-Lien.

Franz-Lien only argues that Podium has failed to meet the first and third prong of the test. On the first prong, Podium has alleged a scheme—in which Franz-Lien deliberately participated—to intentionally steal customers away from Podium. Stealing customers interferes with a business's economic relations. As discussed above, Podium sufficiently alleged that Franz-Lien took a number of steps in furtherance of the scheme.

And on the third prong, the amended complaint clearly alleges an injury to Podium. Franz-Lien contends that the statement in the amended complaint that "Defendants' intentional interference directly caused Podium customers to cancel or refuse renewal of their contracts with Podium" is conclusory and thus the court should disregard it. ECF No. 83, ¶ 104. But the statement derives strong support from the exhibits attached to the amended complaint. *See Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011) ("In evaluating a motion to dismiss, we may consider not only the complaint,

but also the attached exhibits . . . ."). The exhibits attached to the amended complaint specifically discuss many Podium customers who left Podium for Chekkit based on Defendants' alleged interference. Accordingly, the court DENIES Franz-Lien's motion to dismiss the intentional interference claim.

**CONCLUSION AND ORDER**

In conclusion, the court DENIES Franz-Lien's motion to dismiss for lack of personal jurisdiction and motion to dismiss the intentional interference claim. The court GRANTS the individuals defendants' motions to dismiss the civil conspiracy claim and the claim for aiding and abetting violations of the CFAA. Accordingly, Plaintiff's ninth and tenth causes of action are hereby DISMISSED without prejudice as to the individual defendants.

DATED December 6, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge